Good morning. May it please the court, my name is David Tillotson and I am here on behalf of the appellant Michael Turnacliff in his capacity as administrator for the estate of Kathleen Dottie. We're here because the district court here in granting the defendant's motion for summary judgment, the effect of which was to allow the state of California to use $1.8 million of the estate's money for 10 years and paying only 1.69 percent interest under the state's custodial sheet scheme. Regardless of any interest the state may have earned by transferring the money into the cool money investment account or regardless of constructive interest which should have been paid to avoid the violation of the constitutional prohibition on taking property without unjust compensation. Mr. Tillotson, do I understand correctly that the pooled money investment account doesn't always have that much money in it? It is true that the pooled money. $50,000? No. Wrong account? Yeah, what happens, that's the unclaimed property fund. What happens is that the money from the sheeted properties is placed in the unclaimed property fund and then by statute all but $50,000 is moved to the general fund and that unused funds in the general fund are placed in the pooled money investment account. But this money, this is sheeted property, isn't in the pooled money investment account. It's in the general fund and the only money that's, it's all commingled together and possibly all spent. It is all commingled together and that's the crux of the problem. How do you account for any interest that was earned by the state and if the interest does follow the principle which Webb would say, then how can you account for it? There isn't necessarily any interest earned. There may or may not be interest earned, but the state hasn't made any attempt to determine whether or not there was interest earned. The only thing the state has done, I think if you back up to 2002, I think the state's program was pretty clear what the state would do is they'd pay interest pursuant to the different way. Does the state have any obligation to invest the sheeted funds, to place the sheeted funds into an interest-bearing account? The state, I believe the state does have an obligation to safeguard the property. So does it have an obligation to place it into an interest-bearing account as opposed to a non-interest-bearing account? It may have an obligation to safeguard the property. Does it have an obligation to grow the property? I would say that is part and parcel of safeguarding the property as part of a custodial trust. I think that's basically what You're imputing a lot of fiduciary obligation into the word custodial trust. I mean custodial doesn't necessarily bring in a lot of fiduciary obligations. I would agree with you. However, we know that this, well, we believe that the state has, by placing the money into the general fund and the general fund earning interest, there must be some interest component on there. And the problem is, is that What if there is no interest? What if the amount is so small that it can't possibly be placed into an interest-bearing account? There's no evidence that that's the case. Not with this specific property, but what about all the other unclaimed property that eschews to the state? Well, if the state has an obligation to safeguard this property, as they do, then to say that they don't have any obligation to pay any interest whatsoever if the state isn't earning interest is, I think, inconsistent with that obligation. Well, I'm not saying that. I'm saying where is your, where are you deriving an obligation by the state to place these funds into an interest-bearing account at a certain level so that you get the return that you think you should get on the money? I think there's basically two sources of the obligation. I think that there's the fact that the state is using the funds. And if you analogize this to the seizure cases, it's pretty clear that if the state uses the funds and doesn't have to borrow funds because it's using these funds, then you've got constructive interest that would apply here. So that's one instance. Which case does that come from? Oh, well, that comes from the later case. Which case? Later case. That's basically what it says. But why do we need imputed interest? We actually have interest, 1.69 percent. Because 1.69 percent bears no relationship whatsoever to the race of this trust. Well, it bears a relationship to a reasonable interest rate at the time the claim is made for, by the estate. That's true, but the 1.69 percent is simply a function of the state's reading of its own claim. The reading of 1540C at the time leads to some fairly, frankly, strange results. Because what you have is a situation where my client made the claim in May of 2003. The T-bill rate was the lowest it possibly could have been during the entire amount of time that the money was being held by the state. And rather than going back and figuring out, okay, this is the entire amount of money that would have been applied at the T-bill rate during the time this property was held, the state simply says, okay, we're going to pay 1.69 percent. Even if the claim had been made a week later, we would have got an additional $100,000. So that seems inconsistent to me with the state's obligation to administer this unclaimed property fund consistent with its trust obligations to simply say, arbitrarily, you only get 1.69 percent. And that doesn't have any relationship whatsoever to what the state may have earned on the funds or what those funds would have earned or the state's own borrowing capacity if you're looking at the trust. But under the Brown case, don't we look to what the estate lost? And here, what was returned was the value of the stock, the dividends, and interest at a rate that the state determines is appropriate. I mean, it could have not made any interest. They could have not. Once it is sheeted and it's abandoned, they could have just put it in an account where it lost money due to banking fees and charges. I've seen those, too, and not made any interest at all. And in fact, your client may be better off under this system. So what if they lost money? And the client may be better off if the stock hadn't been sold to begin with. But it was. And I understand the Court's point. You're not answering my direct question. I think the fundamental question on your takings claim is, what has your client lost? What is the just compensation that would compensate your client for the value of what they lost? The value of what they lost is whatever interest the money would have earned while it's sitting there in the general fund, transfer the PMIA. It's all mixed up. So it's impossible to determine how much money this really was, what was there at any given period of time. Alternatively But isn't the answer that we don't, that there was no loss because had this not cheated to the state, then, and the estate had not lost track of this investment, no one knows what would have happened to it. They could have lost, it could have been distributed to people who spent it all. They could have lost it all. The state kept it for them in accordance with the statute. The state got to use it, subject to a claim of the estate to pay it and then paid what in 2003 was a reasonable interest rate. There's no loss. There's actually a little bit of a gain. Well, there's no loss at the time that the claim was actually paid, but that money was sitting there. But it wasn't sitting there. The money was actually being used by the state of California because it was put into their general fund and had been put into their general fund for quite a long number of years. And this was a claim for the California to pay it back. And my client, I mean, if my client had made the application for payment a year earlier, an entirely different result would have been reached. And they would have gotten significantly more money. So where is the, if there is a trust relationship, where is the trust relationship constructed so that the timing of the claim is what drives the amount of interest that's allocable to this trust, allocable to the race? Well, apparently for the first several or many decades that the statute existed, there wasn't any interest at all. No, that's true. But they actually also charged 1% for maintaining the property. But I didn't see any constitutionality claim on that statute. And I think that if you look at Wesley and the Seaver cases and the holding of the court in the trial, the magistrate in the Seaver case that's currently pending in San Jose Superior Court, he seems to think that it's clear that some interest obligation does exist here. I think the only way you can measure that interest obligation is to either average the period of time that the property was contained in the state's possession for the benefit of my client, or alternatively, look at the cost of use of funds, because that would be constructive interest. I don't see why there isn't any reason that constructive interest can't be applied here. Well, now, the state determined that it was 1.69% that it would have to pay for the property. It didn't have to pay in the way of interest. It did that by reference to the bond fund for treasury bills or whatever. And for the time the claim was filed, I think you admit they used the correct index to determine the 1.69% for that one time. That's correct. That's correct. Now, the state, then, when it pays the claim, it takes the principal amount, and it adds 1.69% interest for a year. But the money was held for something like 15 years or so, isn't that correct? Yes. So then the next year, they take 1.69% times the same fund, and it's not compounded. Right. And so for each year, every 12 months, they apply 1.69% until they get the amount of interest they owe. And that's the way they computed it. That's correct. Now, the statute seems to talk about a computation, or, well, that's the issue, I guess, every six months. I'm wondering, where do we get that the interest would be computed annually rather than semiannually, which the statute may indicate? I think the statute is unclear here, because it says, the court, the controller shall add interest at the rate of 5% or the bond equivalent of the 13-week United States T-bills, whichever is lower, to the amount of any claim paid the owner under this section for the period the property was on deposit in the unclaimed property fund. That's 15 years. That's 15 years. It's not a difficult calculation to figure out what the, I mean, it really isn't. It could be done on a computer very, very easily, to figure out what the T-bill rate that applied during each one of those six-month periods between 1993 and 2000, when the stock was liquidated in 2000, to arrive at the interest rate that would give you the same return no matter when your claim was actually made. Well, maybe it's that either 5% or the T-bill rate would be something percent, and that means something percent per 12-month period, but I didn't see that in the statute. Well, I think the phrase, for the period the property was on deposit in the unclaimed property fund, are we talking about not the period, not the time that the claim was made, but the period that was on deposit in the unclaimed property fund. Yes. I understand that. Yes, that's correct. That's the difficulty we have with the interpretation that says it's 1.69%, and that's what you get, because this is where you made your claim, and if you had made your claim two weeks later, you would have gotten $100,000 more. I don't remember what the difference in the rate was, but it was there. Or less, or possibly $100,000 less if the T-bill rate went down in the next six-month period. And I guess the T-bill rate at this particular time was the lowest the T-bill rate had been during the entire period the property was in the trust. But that's just a coincidence of the date of the claim. Right. All right. Thank you, counsel. You're welcome. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Zachary Morazzini. I'm a Deputy Attorney General appearing on behalf of the State Comptroller's Office. The District Court's order granting summary judgment in this case should be affirmed for at least three independent reasons. The first being that the State Comptroller's Office properly interpreted and applied the interest provision in effect at all relevant times. Second, the estate has no cognizable claim to interest beyond that provided for by statute. And third, the estate's newly minted claim appearing nowhere in the complaint and never be considered for the first time on appeal. Is that the notice argument? It is, Your Honor. I didn't hear counsel argue it during oral argument. Fair enough. According to the complaint, Ms. Dodd passed away in 1958 and for almost 40 years this stock sat abandoned with the company. Apparently it was not until the company eventually decided to report and remit this stock to the State of California as being the state of Ms. Dodd's last known address was the estate able to discover its existence and claim it as the rightful owner. Okay. So the stock was with the company or the bank? The record indicates it was with the company. The Eklund Company was holding on to the stock. If it didn't report to the state, what would happen to the stock? Well, that's a little bit beyond the record, but I'd be happy to tell you by way of an offer of proof based on information and belief. If we don't have a state statute in place, is it theoretically possible that the company could just decide to take back the dividends and the stock? Perhaps if there's no watchdog, if there's no one for them to answer to, for instance, a state or an heir that discovers the property's existence, it could be like in prior case law discusses the cannibalization of the res due to banking fees and other fees being charged. Perhaps the company could have merged with another company and gone bankrupt, which is beyond the record but is the case here, in fact. But that's the basis, that's the beauty of the unclaimed property law in this situation. The duties imposed on the state of California are to protect the res, to keep the corpus in perpetuity for the true owner to come forward and claim it or for the state under the new statutes to affirmatively go out and find these true owners or their next of kin or their estates. And in this specific case, the unclaimed property law worked perfectly, worked beautifully, in fact, and reunited the estate of Ms. Dodd with over $2 million that had sat abandoned for over 40 years. And when the state comptroller's office paid this claim, it looked to- Does the record reflect how the estate discovered this, that the stock had been turned over to the state and- Unfortunately, no, Your Honor. It's simply not in the record. We could speculate that it's not in the record. I just want to know if it's in the record. Code of Civil Procedure Section 1540, Subdivision C, in effect, at all relevant times here. We don't think it's ambiguous at all. In fact, it expressly directs the state comptroller's office to look at the 13-week U.S. tree T-bill rate in effect at the first option of the, in this case, the July preceding the claim. This is a six-month, this is a rate that's established at the first option and applies for a six-month period thereafter to all claims that are established with the state comptroller's office. This is a rate that I guess you could say locks in, much like if you were to get a mortgage to purchase a house. You lock in at a rate, and that rate applies, and you have a guarantee of a rate. The legislature directed the state comptroller's office to look at the rate, which would be a reasonable market rate. We would agree with counsel that for a given time frame, the specific 13-week U.S. T-bill rate reflects market rate. So it's not the state comptroller's office that determines the rate. It's, in fact, the market for the entirely relevant time period. Here it was 1.69%. Yes, it is a coincidence that that was, in fact, the lowest rate at the time, but nevertheless, that was the rate the market was bearing. The state's argument, I see, is effectively trying to read the term average into the statute, where the word average is simply not there. In fact, we know that when the legislature intends the word average to be applied specifically with reference to 13-week U.S. T-bill rates, it knows how to say so, and, in fact, does it throughout the Revenue and Tax Code with regard to tax overpayment refunds and wrongly withheld tax payment refunds. For example, California's Revenue and Tax Code, Section 6591.5d1, uses the term average. The legislature chose not to do so through the unclaimed property lot at the time this relevant statute was in place. So, therefore, beyond that, the rule in California and in the federal courts, in fact, is that absent a statute or a contract, there is simply no liability for interest for money being held. How do we know that we should just simply do this annually, apply the, because it's an annual interest rate, and, therefore, it means it's applied annually? Well, Your Honor, we look at, when we look back at the terms of the statute, and this was discussed by opposing counsel, the statute reads, quote, for the period the property was on deposit in the unclaimed property fund. Hold on just a second now. Okay. You're looking at 1546, aren't you? I am. I can read it to the court if you'd like, Your Honor. The controller shall add interest at the rate of 5% or the bond equivalent rate of 13-week UST bills, whichever is lower, to the amount of any claim paid the owner under this section, emphasis here, for the period the property was on deposit in the unclaimed property fund, the period being the entire period. That's right. That's clear. Right. But then why wouldn't you just apply 1.9 or 6.9% to the amount of money and say, well, that's what you get, period, one time, one shot, that's it? In fact, that's what the State did, Your Honor. They did not apply. They corrected it, did they, I hope, and then paid out the money for each 12-month period, applying 1.69% every 12 months? Well, Your Honor, under basic accounting principles, it's my understanding that by using the simple interest term, by dictating that any interest required to be paid to this amount shall be computed as simple interest, not compound interest. Yes. It means you take the entire res, you add 1.69% to it, and that's the rate that's paid. But you do that each year, don't you, for the 15 years? I believe that would be compound interest, Your Honor. Of course, I went to law school, not to accounting school, so. Well, I think compound interest would be you would add it in the first year, and then the next year you would take your 1.69 on the principle plus what you had added the first year. That's compounding it. I think perhaps we're saying the exact same thing, then, Your Honor, because whether you add 1.69% each year or 1.69% for the entire time the property was on deposit with the State, you would get the same result. Well, that might be. Your math is probably better than mine. I don't know, Your Honor. But we don't think so, though. I think if you add it every year, the year goes by, and let's say you've got $1,000 on deposit, and you're going to earn interest at 6% per annum. At the end of the first year, then you'd have $1,060. Isn't that right? Sure. Okay. So then you do that for that year. Then the next year you do the whole process again, and you get another $60. So now you get $1,620. Okay. Whereas if you just applied it once, all you'd get would be $1,060. Okay, Your Honor. Perhaps that's what happened here. Yeah, I kind of think that's it. They didn't compound it. And that might make some sense if we said it shall be computed as simple interest, and that's the way you compute simple interest, is annually, I think. For purposes of argument, I would agree with that, but I don't have any personal knowledge as to how it was, in fact, actually calculated. But I believe the estates argument goes well beyond that. The estates argument would have, according to the district court, the estates argument would have the comptroller's office basically apply almost 30 different interest rates averaged out for the entire period that the property was on deposit with the state, and that's simply not supported by the plain language of the statute. Judge Hylston said, yeah, the plain language was to the contrary of that, and therefore then there was no ambiguity in it, I think. Correct. She found no ambiguity in the statute and agreed and deferred to the state comptroller's reading of the statute. Beyond that, I would just like to summarize by stating that in this specific case, the unclaimed property law worked great, in fact, and not only reunited the estate with over $2 million worth of stock, but also with the dividends that it earned in the interim before it was sold, and again with almost 1.7 percent interest, which was a market-bearing rate at the time the claim came in and was established. If there are no further questions, I'm prepared to submit, Your Honors. Thank you, counsel. Thank you. The case of Turnicliff v. Wesley will be submitted. We have previously submitted Wong v. Bush, and therefore this session of this Court will be adjourned for today. Thank you. Thank you.
judges: Thompson, Wardlaw, Bolton